CHARLES M. THOMSON, TRUSTEE, APPELLANT, V. NEBRASKA STATE RAILWAY COMMISSION, APPELLEE.

8 N. W. (2d) 552

FILED MARCH 19, 1943. No. 31557.

*Wymer Dressler* and *Robert D. Neely,* for appellant.

*Walter R. Johnson, Attorney General,* and *Edwin Vail, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESS-MORE, YEAGER, CHAPPELL and WENKE, JJ.

CHAPPELL, J.

Charles M. Thomson, trustee of the property of the Chicago & Northwestern Railway Company, made application in writing to the Nebraska state railway commission for an order authorizing discontinuance of the agent at Oak, Nebraska, and substitution of a caretaker. The application was denied, one of three commissioners dissenting, and appeal is taken to this court. We reverse the order of the Nebraska state railway commission, bearing in mind that the ruling of the railway commission or of this court on the question of discontinuance of an agency and substitution of a caretaker at any given time does not amount to an adjudication for the future, but is only a judgment on the circumstances presented by the application, and relates only to the time and conditions presented. Rules of law applicable and controlling under the presented facts and circumstances have been clearly established by this court and other jurisdictions. In this opinion we first set forth these rules of law and then apply them to the facts.

If an order of the Nebraska state railway commission is administrative or legislative in character as distinguished from the judicial function, the only question for decision on appeal is whether its action was unreasonable or arbitrary, within its jurisdiction, or violative of legal and constitutional rights. *Thomson v. Nebraska State Railway Commission,* 141 Neb. 697, 4 N. W. (2d) 756; *Thomson v. Nebraska State Railway Commission,* 142 Neb. 477, 6 N. W. (2d) 607; *Furstenberg v. Omaha & C. B. Street R. Co.,* 132 Neb. 562, 272 N. W. 756.

The prime object and real purpose of Nebraska state railway commission control is to secure adequate, sustained

service for the public at minimum cost and to protect and conserve investments already made for this purpose. In doing this, primary consideration must be given to the public rather than to individuals. *In re Application of Chicago, B. & Q. R. Co.,* 138 Neb. 767, 295 N. W. 389.

Whether a railroad company may change a station from agency to caretaker service depends upon the facts and circumstances of the particular case. *Thomson v. Nebraska State Railway Commission,* 141 Neb. 697, 4 N. W. (2d) 756; *Lowden v. State,* 182 Okla. 549, 78 Pac. (2d) 1059; *In re Chicago, Milwaukee, St. P. & P. R. Co.,* 26 P. U. R. n. s. 390; *State, ex rel. Railroad Commissioners, v. Atlantic Coast Line R. Co.,* 77 Fla. 366, 81 So. 498. The facilities and services to be furnished by a railroad company at any station need only be just, reasonable and adequate to the requirements of the station, and should in a measure be commensurate with the patronage and receipts from that portion of the public to whom such service is rendered. The need for agency service should not be measured by financial results alone, but should be measured also by the agent's usefulness to the company as well as to the public. See *Lowden v. State,* 188 Okla. 106, 106 Pac. (2d) 801.

In the performance of an absolute duty imposed upon a railroad company the question of expense is not considered, but when the duty sought is convenience rather than necessity the questions of expense to the company, the volume of business done, service required in meeting community needs, revenue returned therefrom, and relative benefit to the public served, are factors which cannot be disregarded. *Lowden v. State,* 189 Okla. 491, 118 Pac. (2d) 238; 51 C. J. 988, 994. Contemplated future increase in railroad transportation and resulting increase in station business is also a factor which should be given consideration, but it is unreasonable to deny permission to substitute a caretaker for an agent on that premise unless well-defined business prospectives are established by the evidence with reasonable certainty. *Thomson v. Nebraska State Railway Commission,* 141 Neb. 697, 4 N. W. (2d) 756; *Thomson v. Nebras-*

*ka State Railway Commission,* 142 Neb. 477, 6 N. W. (2d) 607.

Permission should be authorized to change from agency to caretaker service where the cost of agency service and the time necessarily devoted by the agent to performance of duty required is substantially out of proportion to revenue derived from that portion of the public benefited, especially when the proposed substitution although less convenient affords the same essential service without abandonment of physical facilities. *Atchison, T. & S. F. Ry. Co. v. State,* 189 Okla. 485, 118 Pac. (2d) 202; *Lowden v. State,* 189 Okla. 495, 118 Pac. (2d) 242; *State v. Thomson,* 210 Minn. 147, 297 N. W. 715; *Kurn v. State,* 18 P. U. R. n. s, 521, 179 Okla. 440, 66 Pac. (2d) 52; *Thomson v. Nebraska State Railway Commission,* 141 Neb. 697, 4 N. W. (2d) 756; *Thomson v. Nebraska State Railway Commission,* 142 Neb. 477, 6 N. W. (2d) 607.

A final order of the Nebraska state railway commission granting or denying a railroad company permission to substitute a caretaker for an agent is unreasonable and arbitrary unless its findings and conclusions conform to the law and are supported by the evidence. *In re Application of Chicago, B. & Q. R. Co.,* 138 Neb. 767, 295 N. W. 389; 51 C. J. 60, 63.

The record in this case discloses that the evidence is undisputed. Oak is a village of 177 population, located on the Fremont-Superior branch of appellant's railroad in Nuckolls county, Nebraska. The village is seven and six-tenths miles west of Davenport, six and eight-tenths miles east of Nora, and eighteen and eight-tenths miles east of Superior, the terminus connecting with three other railroads. All are agency stations.

Train service at Oak is tri-weekly, mixed passenger and freight, west-bound on Monday, Wednesday and Friday at 1:40 p. m., and east-bound on Tuesday, Thursday and Saturday at 11:00 a. m. Agency service now given is excellent, cooperative and accommodating. In spite of this effort, business has declined during the past five years until

the agent now would be able to do all of a year's required work in not to exceed one week. The total cost of operation and maintenance at this station in 1941 was $1,875.29. Appellant is not ordinarily required to pay a salary to a caretaker, the latter being furnished living quarters, heat and light as compensation. Authorization of the proposal will save the company the salary of an agent, payroll taxes, and incidental office expenses.

Assigned revenue at this station, both local and interline, show a decline from $4,321.64 in 1937 to $1,851.38 in 1940 and $1,760.60 in 1941 (10 months). The gross passenger service revenue including baggage, milk and miscellaneous declined from $209.19 in 1937 to $26.53 in 1940 and $14.60 in 1941 (10 months). Comparison shows that the percentages of station expenses to station revenue were 38.96 in 1937, 95.19 in 1940 and 88.04 in 1941 (10 months). It is interesting to note that the average percentages of station expenses to station revenue at stations over the whole of appellant's system in this period were 8.30 in 1937, 8.27 in 1940, and 7.43 in 1941 (10 months).

Carload station business consists of fuel and lumber inbound, with grain and live stock outbound and going beyond appellant's line. In the last five years only 94 carloads were outbound and 110 received, and less than carload shipments, both received and forwarded, were less than two a day. There were only 98 less than carload shipments outbound during this whole period.

The business establishments are such as are ordinarily found in a village of the size and location of Oak. Its adjacent gravel and black-surface highways, while not the best, are adequate. Eleven trucking operators are serving the village. Approximately two-thirds of the less than carload inbound shipments and a part of the outbound shipments were carried by truck.

People in the surrounding territory are engaged in farming and such live stock raising and dairying as are incidental. Live stock in the community has declined 50 per cent. since 1930. There is some live stock feeding but not enough

present or prospective to be of importance. There is a flour mill one and three-fourths miles south of Oak which contemplates modernization and operation, if crop conditions improve. It has not operated for four years except for local grinding, with no shipments. Crops have been generally drouth-stricken or winter-killed for several years, but were slightly improved in 1941. If there is any evidence of a contemplated increase in business at this station it is merely speculative and conjectural, purely prospective without tangible prospects.

The proposed change from agency to caretaker service contemplates no alteration of train service and schedules, abandonment of property facilities or discontinuance of essential service, although there will undoubtedly be some inconvenience. The station is equipped with living quarters where the caretaker will reside. He will keep the station lighted, clean and warm, and be available when his services are required. Free toll telephone service will be maintained to Davenport and Nora, adjacent stations. When requested the caretaker will secure information relating to train service or rates; order cars spotted for shippers, or forward and receive telegrams. He will not register complaints, handle money, or do any paper work. All shipments received must be prepaid, but the caretaker will protect and release them to consignees. All shipments forwarded will be waybilled by the next agent in line of traffic. Shipments of cream and baggage will be handled as usual but will be waybilled and checked by the baggageman. Passengers will buy tickets from the conductor on the train at no higher rate.

This appellant is now in process of reorganization under section 77 of the bankruptcy act. It is still in litigation and operating with a trustee under a plan announced by the interstate commerce commission. This plan squeezes out investments, substantially cuts returns to bondholders, and reduces interest charges on funded debt. In 1941, for the first time since 1930, this appellant's system had a balance after paying expenses. This increase was largely due

.to business resulting from long hauls necessitated by a great war, still in progress. Upon its duration or future needs we cannot speculate. A railroad company, under these circumstances, is under obligation to the public generally to effect all reasonable economies so long as reasonably adequate and satisfactory service is still rendered to the public.

After giving careful consideration to all the evidence and applicable precedent, we conclude that the order of the Nebraska state railway commission is unreasonable and arbitrary. It should be, and hereby is, reversed and the cause remanded, with directions to such commission that an order be entered by it as provided by law allowing a discontinuance of the agency at Oak, Nebraska, and the substitution of a caretaker as prayed in the application.

REVERSED.