LOWDEN et al. v. STATE.

No. 29886.    May 27, 1941.

*113 P. 2d 991.*

W. R. Bleakmore, Robert E. Lee, John Barry, and W. L. Farmer, all of Oklahoma City, for plaintiffs in error.

L. V. Reid, General Counsel for Corporation Commission, and S. J. Gordon

and Ed White, Assts., for defendants in error.

CORN, V. C. J. This is an appeal from the findings and order of the Corporation Commission denying the application of the appellant for authority to discontinue the regular station agent at Red Oak, Okla., and to substitute therefor a caretaker.

The authority is sought on the alleged ground that the revenue earned by said station does not justify continued services of the present agent, who is a combination telegrapher-agent.

The findings of the commission furnish a sufficient statement of the facts for a proper understanding of the case, and in order to avoid duplication in the statement of the case and the action of the commission, we are incorporating herein the essential portions thereof, and omitting the formal and nonessential portions:

"The Commission finds from the evidence adduced at said hearing that Red Oak is located on the line of the Chicago, Rock Island and Pacific Railway Company in Latimer County, Oklahoma. The nearest open agency stations on either side thereof are Wilburton to the west, a rail distance of thirteen miles, and Wister to the east, a rail distance of twenty miles. Wilburton and Wister are both telegraphic stations. The Red Oak station is presently served by a full time telegrapher agent.

"Red Oak has a population of about seven hundred. Corn, cotton, livestock and produce are raised in the immediate vicinity. Coal mines are located near Red Oak, however activity in connection therewith has been curtailed to a large extent. The town supports about twenty business establishments, four churches, and a high school with an enrollment of approximately 132 and a grade enrollment of about 150. Business activity appears to be on an upgrade.

"During the thirteen months period from August, 1938, to August, 1939, inclusive, the following revenues and expenses were received and incurred at the Red Oak Station:

*Freight Revenues*

| | | |
|---|---|---|
| Carload traffic—Forwarded | | $129.70 |
| —Received | | 647.63 |
| L. C. L. traffic—Forwarded | | 441.13 |
| —Received | | 587.74 |
| | | $1,806.20 |
| Passenger Revenue | | $415.25 |
| Express Revenue | | 285.16 |
| Milk & Cream Revenue | | 176.06 |
| Misc'l. Revenue | | 28.96 |
| Total Station Revenue | | $2,711.63 |

*Station Expense*

| | | |
|---|---|---|
| Maintenance | | $ 6.13 |
| Agent's Salary, including Commissions | | 1859.56 |
| Other Misc'l. Station Expense | | 25.30 |
| | | $1,890.99 |
| Net gain | | $820.64 |

"Application of the fifty per cent rule to freight and express revenues results in the station being credited with $1,665.95 in revenues from all sources as compared with $1,890.99 total station expense, thus reflecting a net loss of $225.04 for said thirteen months period.

"In the event caretaker service be substituted in lieu of the present telegrapher agent, there would be no telegraph facilities at the station. The station would be locked and opened by the caretaker only before the arrival of passenger trains. Inbound freight shipments must be prepaid at point of origin and contrary to usual business practices. Outbound freight will have to move collect at point of destination. Passenger tickets will have to be sold on the trains and all billing of freight must be made at an agency station, in this case Wilburton or Wister, the nearest open stations on either side of Red Oak. It appears that baggage and freight would be in the carrier's possession without official receipt to the shippers until the same reached the nearest agency station for billing.

"The service to be rendered by the caretaker would not be as satisfactory as, and much inferior to that performed by the present telegrapher agent. Such an agent is usually well prepared to serve the public in all matters pertaining to shipping, shipping arrangements and passenger service. An agent has in his possession freight and passenger tariffs from which he may give the public information on any subject pertaining to the shipment of freight and the carriage of passengers. On the other hand, freight and passenger **tariffs** would not be available through caretaker service. The caretaker would sell no tickets, issue no bills of lading or

collect freight charges. He would be on duty only part time, meeting the trains and taking care of the station building. He would receive approximately $15.00 per month. On the whole, caretaker service would prove to be grossly unsatisfactory and inadequate.

"The present telegrapher agent receives 68c per hour. A nontelegrapher agent, who would perform the same work now done by the telegrapher agent except handling telegraph business, may be obtained at the rate of 53c per hour. The telegrapher agent, during the thirteen months period above referred to, received $1,839.53 at 68c per hour, working a total of 2,705.2 hours. (1,839.53 divided by .68). The same number of hours at 53c would amount to $1,433.76 or a difference of $405.77 for said thirteen months period. It thus appears that if a nontelegrapher agent had been employed during that period, the station would have shown a net gain in the amount of $180.73.

"Inasmuch as it appears that caretaker service at Red Oak would prove to be wholly unsatisfactory and a nontelegrapher agent may be secured who would perform adequate service to the public at Red Oak and that the substitution of a nontelegrapher agent would result in the station showing a net profit, the Commission is of the opinion that authority should be given the carrier to discontinue the present telegrapher agent, provided a nontelegrapher agency service is afforded in lieu thereof.

"The Commission further finds that the proposed caretaker service would not afford such public service, facilities and conveniences as are reasonable and just and adequate to the requirements of said station, and that said service would not be commensurate with the patronage and receipts thereof. Nontelegrapher agency service would prove to be adequate and commensurate with the patronage and receipts of the station."

In accordance with the foregoing findings the commission entered its order authorizing the discontinuance of the present telegrapher agent service, provided nontelegrapher service is afforded in lieu thereof.

The plaintiff in error presents its argument under the two following propositions:

1. "The maintenance of a regular station agent is not an absolute duty, but is one of additional convenience which can only be required when the revenue derived from the public benefited thereby is commensurate with the expense thereof.

2. "The order of the Corporation Commission denying plaintiffs in error's application and requiring them to maintain a regular station agent at Red Oak is arbitrary, unreasonable, unjust and contrary to law and the evidence, in that the expense thereof is out of proportion to the revenue derived from the public benefited thereby."

In support of the first proposition the plaintiff in error cites Kurn v. State, 175 Okla. 379, 52 P. 2d 841; Kurn v. State, 179 Okla. 440, 66 P. 2d 52; Lowden et al. v. State, 186 Okla. 654, 100 P. 2d 890, which distinguish between an absolute duty and one of additional convenience only. Obviously, the plaintiff in error, in the statement of its first proposition, is contending for a more constricted interpretation of the rule than the language used will permit. In Kurn v. State, 175 Okla. 379, 52 P. 2d 841, which was followed by the other two cases, supra, the rule is stated in paragraphs 2, 3, and 4 of the syllabus, as follows:

2. "In the performance of an absolute duty by the railway company the question of expense is not to be considered, but where the duty sought to be enforced is one of additional convenience rather than necessity, the question of expense to the company and relative benefit to the public is the deciding factor and may not be disregarded."

3. "The facilities required to be furnished at any station need only be adequate to the requirements of said station and should be in a measure commensurate with the patronage and receipts from that portion of the public to whom service is rendered."

4. "The term 'adequate or reasonable facilities' is not in its nature capable of

exact definition. It is a relative expression, and has to be considered as calling for such facilities as might be fairly demanded, regard being had, among other things, to the size of the place, the extent of the demand for transportation, the cost of furnishing the additional accommodation asked for, and to all other facts which would have a bearing upon the question of convenience and cost. Chicago, R. I. & P. Ry. Co. v. State, 117 Okla. 175, 245 P. 656."

The division of duties into two classes is useful in analyzing a given situation, but it does not have any controlling significance. It is subordinate to the rule that the railway company must, under any circumstances, furnish facilities and services which are adequate and reasonable.

The determining issue in this case is involved in the second proposition of the plaintiff in error, wherein it is contended that the order is arbitrary, unreasonable, unjust, and contrary to law and the evidence, in that the expense of maintaining a regular station agent at said station is out of proportion to the revenue derived from the services afforded at that point.

One of the primary duties of a railway company, as a common carrier, is that of furnishing reasonable and adequate facilities and conveniences to its patrons, and this may be required even though some pecuniary loss is occasioned thereby. In Chesapeake & O. R. Co. v. Public Service Com., 242 U. S. 603, 61 L. Ed. 520, 37 S. Ct. 234, the Supreme Court of the United States announced the rule as follows:

"One of the duties of a railroad company doing business as a common carrier is that of providing reasonably adequate facilities for serving the public. This duty arises out of the acceptance and enjoyment of the powers and privileges granted by the state, and endures so long as they are retained. It represents a part of what the company undertakes to do in return for them, and its performance cannot be avoided merely because it will be attended by some pecuniary loss."

In Lowden et al. v. State, 182 Okla. 549, 78 P. 2d 1059, this court stated the rule as follows:

"When a railway company has a franchise from the state of Oklahoma to engage in the general railroad business within this state, it is a common carrier and owes to the communities through which it operates its lines a duty to furnish a service commensurate with the needs of the communities, and this duty exists as long as the railway company enjoys the franchise. The circumstances of the business of each particular community governs the nature of the services and facilities required to be furnished."

The order of the Corporation Commission based upon the facts in the record is presumed, upon appeal to the Supreme Court, to be prima facie just, reasonable, and correct. If there is any evidence reasonably tending to support the order, then the burden is upon the appellants to show, by evidence so strong and conclusive as to overcome all presumptions in its favor, that the same is unreasonable and unjust. Unless they meet that burden, the order of the commission must be affirmed. Lowden v. State, 188 Okla. 106, 106 P. 2d 801.

The findings of the commission show only a small loss to the railway company under telegrapher agent service at said station, and that the nontelegrapher agent service authorized by the order would show a profit. It is apparent from the evidence in the record that caretaker service would be grossly inadequate and would not be justified by the circumstances of this case.

The appellant has failed to meet the burden cast upon it by the Constitution of overcoming the prima facie presumption in favor of the reasonableness, justness, and correctness of the order, and said order should be, and is, affirmed.

WELCH, C. J., and RILEY, OSBORN, and DAVISON, JJ., concur.